UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Everard Findlay Consulting, LLC,

                      Plaintiff,

      –v–

Republic of Suriname,

                      Defendant.

18-CV-8926 (AJN)

OPINION
& ORDER

ALISON J. NATHAN, District Judge:

    Before the Court is Defendant Republic of Suriname's supplemental motion to dismiss Plaintiff Everard Findlay Consulting, LLC's amended complaint for breach of a contract under which Everard provided services to promote tourism in Suriname. The Court previously dismissed Everard's amended complaint for lack of subject of subject matter jurisdiction under the Foreign Sovereign Immunities Act. The Second Circuit reversed that decision and remanded to this Court to resolve Suriname's remaining argument for dismissal on the basis of *forum non conveniens*. For the reasons that follow, the Court DENIES Suriname's motion to dismiss.

**I. Background**

  **A. Factual background**

    The following facts are drawn from Everard's amended complaint and the sworn declarations submitted by the parties. *See Little v. XL Ins. Co. SE*, No. 18-CV-11919 (VB), 2019 WL 6119118, at *2 (S.D.N.Y. Nov. 18, 2019) (citing *Aguas Lenders Recovery Grp. LLC v. Suez, S.A.*, 585 F.3d 696, 697 n.1 (2d Cir. 2009)).

    Everard Findlay, LLC ("Everard") provides "comprehensive, multimedia branding campaign and strategic consultancy services." Am. Compl. ¶ 1, Dkt. No. 24. It is a limited

1

liability company organized under the laws of New York in September 2009 and its sole member is Everard Findlay ("Findlay"), who is a native of Trinidad and Tabago, a U.S. citizen, and has been a New York resident since 2000.  Findlay Decl. ¶¶ 2–3, Dkt. No. 59.  In December 2011, Findlay was introduced by Suriname's ambassador to the United Nations to the head of Suriname's Chamber of Commerce and to Suriname's Foreign Minister.  *Id.* ¶¶ 9–10; Reeder Decl. ¶ 4, Dkt. No. 56.  Findlay met with the ambassador at Suriname's Mission to the United Nations in New York City, and the ambassador expressed an interest in Everard's brand consulting services.  Findlay Decl. ¶¶ 10–11.

In May 2012, Findlay began negotiations over a brand consulting agreement with officials of the Suriname government, during which time Findlay "made several trips to Suriname" to learn about the country, pitch his services, and negotiate, in addition to at least one instance of "face-to-face negotiations with [a Suriname official] in New York."  *Id.* ¶ 12; Reeder Decl. ¶¶ 6–8.  On October 1, 2012, Everard and Suriname signed a Branding Consultation Agreement in New York City.  Am. Compl. ¶ 19; Findlay Decl. ¶ 13.  Findlay signed on behalf of Everard and Suriname's Foreign Minister signed on behalf of Suriname.  Reeder Decl. ¶ 10.  The listed objectives of the Branding Consultation Agreement included:

- "Create a sustainable, dynamic, specific, recognizable and competitive brand for Suriname that will be used in marketing the country domestically, regionally, and internationally";

- "Recommend and facilitate projects that will enhance the brand experience and support the promotion of Suriname as an attractive place to invest, live, and visit domestically, regionally, and internationally";

- "Stimulate greater desire for international visitors to come to Suriname and for citizens of Suriname to tour their own country";

- "Utilize targeted forums to position Suriname as an attractive tourist destination"; and

- "Create advertising, communication and branding initiatives[.]"

Reeder Decl., Ex. B at 1.

Suriname agreed to pay Everard an initiation fee of $60,000, a monthly fee of $16,040, and project fees for approved budgets as well as payment for transportation and hotel expenses. *Id.*, Ex. A at 2. From this Branding Consultation Agreement, Everard proposed, and Suriname agreed to, four projects to achieve the identified objectives: the Web Development & Internal "We Are Suriname" Advertising Campaign (hereinafter, "the 'We Are Suriname' Campaign" or "the Campaign"), the Erwin de Vries Art Market Project, the Designer Collaboration Project, and the Central Bank van Suriname Investment Guide & DVD. Am. Compl. ¶¶ 25–34. Suriname agreed to these four projects on January 23, 2013, in Suriname. *Id.* ¶ 26; Reeder Decl. ¶ 13. The "We Are Suriname" Campaign is the "project at issue in this action" and the basis for the damages claimed in the amended complaint. Findlay Decl. ¶ 20; *see* Am. Compl. ¶¶ 63, 71, 74. Briefly, the Campaign involved the creation of a web platform through which Suriname could communicate with potential investors and tourists and a "We Are Suriname" print media advertising campaign that promoted the sights and culture of Suriname, to be distributed both within Suriname and abroad. Am. Compl. ¶¶ 27–30. The Campaign also called for Everard to establish a social media presence for Suriname and to "act as Suriname's press office" in managing the country's public relations. *See* Reeder Decl., Ex. C at 4 (the "We Are Suriname" Campaign project estimate). The estimated cost of the Campaign, separate from the other three projects, was $3,879,211. *Id.* at 7.

The parties disagree, at times markedly, about precisely which ideas were conceived by whom and what work occurred where. According to Everard, it "conceived of the projects," including the Campaign at issue, "in New York." Am. Compl. ¶ 5; Findlay Decl. ¶¶ 21–23. Further, Everard contends that the "development, design and all related tasks related to the

preparation of the website . . . were all performed in New York" under Findlay's supervision and that the "majority" of other tasks occurred in New York, whether by Findlay himself or by New York-based subcontractors hired by Everard.  Findlay Decl. ¶¶ 29–30; *see also id.* ¶¶ 5, 32–33.  By contrast, Suriname claims that the Campaign "was conceived by Suriname, in Suriname," and that Everard's "performance of the engagement was necessarily centered on Suriname."  Reeder Decl. ¶¶ 15–16.  The parties agree, however, that Findlay personally traveled to Suriname at least ten times, for at least a week each trip, and held multiple meetings in Suriname during these visits.  *Id.* ¶¶ 16–17; Findlay Decl. ¶ 30.

Nor do the parties agree whether the Campaign was targeted at New York and the United States—as is Everard's telling—or was targeted more generally to an international audience as well as inwardly to Suriname—as is Suriname's telling.  According to Everard, "the target of the [Campaign] was the United States, specifically New York."  Findlay Decl. ¶ 21.  It points, as proof, to emails sent by Suriname officials that suggest targeting wealthy tourists in the United States and media promotions in New York City.  *Id.* ¶¶ 21–23.  Everard also identifies an event hosted in New York City on April 9, 2014, that was attended by a Suriname government official and by Maikel Reeder, who was employed by the Suriname government to oversee and facilitate Everard's work.  *Id.* ¶¶ 34–37; *see* Goossens Decl. ¶ 3, Dkt. No. 61.  Suriname, for its part, argues that this targeting of the United States, and the events in New York City, were part of other projects—like the Designer Collaboration Project—and not the "*Internal* 'We Are Suriname' Project," which it claims was intended to be internal to Suriname.  Goossens Decl. ¶¶ 6–11.  Notably, despite the "internal" descriptor, the description of the "We Are Suriname" Project refers repeatedly to branding efforts "internationally."  *E.g.*, Reeder Decl., Ex. C at 2–3 (referring to "branding applications domestically and internationally," "[i]nternational

4

placement" negotiated by Everard, placement with "international and local printed periodicals," and bringing "Suriname to the forefront of the international conversation").

Everard contends that it performed the work satisfactorily and alleges that Suriname chronically made late payments and eventually ceased payment altogether. Am. Compl. ¶¶ 59, 61–66. In turn, Everard stopped working on its Suriname projects. *Id.* ¶ 68. Suriname argues that it ceased payments to Everard because its work was inadequate. *See, e.g.*, Reeder Decl. ¶¶ 20–23. Everard claims that it is owed approximately $2.2 million in relation to the Campaign. Am. Compl. ¶¶ 71–72.

### B. Procedural history

Everard filed suit against Suriname on September 28, 2018, Dkt. No. 1, and filed an amended complaint on April 15, 2019, Dkt. No. 24. The Court on April 30, 2020, granted Suriname's motion to dismiss, holding that the Foreign Sovereign Immunities Act barred the action. Dkt. No. 43. The Second Circuit on December 28, 2020, vacated the Court's decision, concluding that its intervening decision in *Pablo Star Ltd. v. Welsh Government*, 961 F.3d 555 (2d Cir. 2020), required that Suriname be denied sovereign immunity. *Everard Findlay Consulting, LLC v. Republic of Surin.*, 831 F. App'x 599 (2d Cir. 2020).

The Second Circuit remanded the case for the Court to consider Suriname's *forum non conveniens* argument, which the Court had not considered. *Id.* at 602 & n.3. Suriname filed the supplemental motion to dismiss, raising only a *forum non conveniens* argument, on March 5, 2021. Dkt. No. 54. The motion is fully briefed. Everard Br., Dkt. No. 55; Suriname Br., Dkt. No. 58; Everard Reply, Dkt. No. 60. The Court considers, too, the briefs submitted by the parties in support of, and in opposition to, Suriname's original motion to dismiss. Dkt. Nos. 30, 33, 39.

## II.   Legal Standard

Typically, a court considering a motion to dismiss "must limit its analysis to the four corners of the complaint." *Vassilatos v. Ceram Tech. Int'l, Ltd.*, 92-CV-4574, 1993 WL 177780, at *5 (S.D.N.Y. May 19, 1993) (citing *Kopec v. Coughlin*, 922 F.2d 152, 154–55 (2d Cir. 1991)). "On a motion to dismiss for *forum non conveniens* that is decided without a factual hearing, the Court must accept as true the facts alleged in the complaint, but may also consider certain evidence outside the pleadings, including affidavits." *Little*, 2019 WL 6119118, at *2 (citing *Aguas Lenders Recovery Grp. LLC*, 585 F.3d at 697 n.1); *In re Herald, Primeo & Thema Funds Sec. Litig.*, No. 09 CIV. 2032 (RMB) (HBP), 2011 WL 4056819, at *4 (S.D.N.Y. Sept. 8, 2011) ("[T]he 'well established practice' in this Circuit is to decide forum non conveniens motions on the basis of affidavits or declarations alone." (quoting *Alcoa S.S. Co. v. M/V Nordic Regent*, 654 F.2d 147, 158 (2d Cir. 1980) (en banc))).

### III.     Discussion

"The principle of *forum non conveniens* is simply that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947)). Whether to dismiss a case on *forum non conveniens* grounds "lies wholly within the broad discretion of the district court." *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (en banc) (quoting *Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996)). The moving party "bears the burden of proof on all of the elements of [a] motion" seeking dismissal under *forum non conveniens* grounds. *Bank of Credit Com. Int'l (Overseas) Ltd. v. State Bank of Pak.*, 273 F.3d 241, 246 (2d Cir. 2001).

"An evaluation of a motion to dismiss on the grounds of *forum non conveniens* proceeds in several stages." *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir. 2003). First, a court must determine "'whether the plaintiff's choice of forum is entitled to more or less deference.'" *Id.* (internal brackets omitted) (quoting *Iragorri*, 274 F.3d at 73). Regardless of the level of deference owed, the court "still must conduct the analysis set forth out in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947)," and "determine whether an adequate alternative forum exists." *Id.* (citing *Iragorri*, 274 F.3d at 73). If it does, "the court must go to the third step and balance factors of private and public interest to decide, based on weighing the relative hardships involved, whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum suggested by the defendant." *Id.* (citing *Gilbert*, 330 U.S. at 507–09).

Dismissal based on this balancing analysis is warranted "when trial in the chosen forum would 'establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems.'" *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981) (alterations in original) (quoting *Koster v. (American) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947)). Moreover, "the greater the degree of deference to which the plaintiff's choice of forum is entitled" pursuant to the first prong of the analysis, "the stronger a showing of inconvenience the defendant must make to prevail in securing *forum non conveniens* dismissal." *Iragorri*, 274 F.3d at 74. Indeed, "unless the balance [of interests] is strongly in favor the defendant, the plaintiff's choice of forum"—if legitimate—"should rarely be disturbed." *Gilbert*, 330 U.S. at 508; P*etersen Energia Inversora S.A.U. v. Argentine Republic*, No. 15 CIV. 2739 (LAP), 2020 WL 3034824, at *5 (S.D.N.Y. June 5, 2020)

7

(explaining that "dismissal for *forum non conveniens* is the exception, not the rule" (quoting *In re Lloyd's Am. Tr. Fund Litig.*, 954 F. Supp. 656, 673 (S.D.N.Y. 1997)))).

After proceeding through these three steps, the Court declines, in the exercise of its broad discretion, to dismiss Everard's claims.

### A. Everard's choice of forum

At the first step, "the degree of deference given to a plaintiff's forum choice varies with the circumstances"; the plaintiff's choice is "generally entitled to great deference when the plaintiff has sued in the plaintiff's home forum." *Iragorri*, 274 F.3d at 71. That deference "is fortified where an American plaintiff brings suit against a foreign entity and the alternative forum is foreign." *David Tunick, Inc. v. Kornfeld*, 813 F. Supp. 988, 992 (S.D.N.Y. 1993) (citing *Olympic Corp. v. Societe Generale*, 462 F.2d 376, 378 (2d Cir. 1972)). The plaintiff's choice receives further deference the greater "the lawsuit's bona fide connection to the United States and to the forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States." *Iragorri*, 274 F.3d at 72.

Here, the Plaintiff, Everard, is a limited liability corporation formed in New York years before it entered any relationship with Suriname and its operations are headquartered in New York. Its sole member, Findlay, is a resident of New York and a U.S. citizen. In short, Everard chose to file suit in its home forum and the Court must accord that choice "substantial deference." *Petersen*, 2020 WL 3034824, at *6; *Gross v. Brit. Broad. Corp.*, 386 F.3d 224, 231 (2d Cir. 2004) ("This case therefore presents a situation in which courts should initially be at their most deferential: a U.S. plaintiff suing at home for valid reasons.").

Further, the lawsuit has substantial bona fide connections to the United States and to New York that support Everard's choice. On appeal of this Court's prior Opinion & Order, the

Second Circuit concluded that, as alleged in the amended complaint, "Suriname's commercial activity had substantial contact with the United States": it "chose to deal with an American company," "key contractual negotiations [allegedly] occurred in New York, many aspects of the contract were performed in New York, Suriname paid under the contract by wiring U.S. dollars to U.S. bank accounts, and the contract targeted the U.S. travel market." *Everard Findlay Consulting, LLC*, 831 F. App'x at 601.  As explained above, the sworn declarations submitted by the parties, interpreted in a light favorable to Everard, substantiate these allegations.

Suriname argues that the substantial deference normally accorded to a U.S. plaintiff suing in its home district should be reduced here because Findlay actively sought out business with Suriname and traveled to Suriname to do so.  But the Second Circuit has previously rejected a similar argument for dismissal.  In *Gross*, for example, a New York plaintiff "flew to England in hopes of making a deal with the companies located there," but the Second Circuit concluded that despite plaintiff "seeking out business in that country," the district court erred in not deferring to the plaintiff's choice to sue in her home district.  *Gross*, 386 F.3d at 231; *accord Petersen*, 2020 WL 3034824, at *8 (rejecting an argument that a plaintiff seeking out business abroad reduces deference to its choice, emphasizing that "a significant portion of the events giving rise to the litigation took place in New York and involved a New York-based business"); *Iragorri*, 274 F.3d at 75 ("Heightened deference to the plaintiffs' chosen forum usually applies even where a plaintiff has temporarily or intermittently resided in the foreign jurisdiction.").

The Court therefore affords substantial deference to Everard's choice of forum.  That conclusion "substantially favors" Everard, but does not end the matter.  *See Gross*, 386 F.3d at 231 (citing *Piper Aircraft*, 454 U.S. at 255 n.23); *Little*, 2019 WL 6119118, at *3 ("[A]

plaintiff's choice of home forum is not entitled to 'talismanic significance.'" (quoting *Overseas Media, Inc. v. Skvortsov*, 441 F. Supp. 2d 610, 616 (S.D.N.Y. 2006)).

### B. Adequacy of Suriname as an alternative forum

The Court must next determine whether Suriname would be an adequate alternative forum. "An alternative forum is generally adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits litigation of the subject matter of the dispute." *Alfandary v. Nikko Asset Mgmt. Co.*, 337 F. Supp. 3d 343, 354 (S.D.N.Y. 2018) (quoting *Bank of Credit*, 273 F.3d at 246). Suriname submitted a sworn declaration that establishes Suriname satisfies these requirements: Suriname is amenable to process in its courts, the courts have jurisdiction to hear this breach-of-contract dispute, and Everard may present contrary evidence and appeal any adverse ruling. Panday Decl., Dkt. No. 21. If these requirements are satisfied, it is only in "rare circumstances" that a forum is nevertheless inadequate because "the remedy offered by the other forum is clearly unsatisfactory." *Murray v. Brit. Broad. Corp.*, 81 F.3d 287, 292 (2d Cir. 1996) (quoting *Piper Aircraft*, 454 U.S. at 254 n.22).

Everard raises several objections to Suriname as an adequate forum. The Court is not persuaded by any of them. First, Everard observes that Suriname's court system is "burdened by significant delays and corruption," Everard Br. at 6 n.6, and cites in support one report from 2019 that the average time to resolve a commercial dispute in Suriname is 1,715 days, Am. Compl. ¶ 16. But that degree of delay in resolution does not render Suriname an inadequate forum. *See In re Air Crash Near Peixoto De Azeveda, Brazil, on Sept. 29, 2006*, 574 F. Supp. 2d 272, 284 (E.D.N.Y. 2008), *aff'd*, 354 F. App'x 585 (2d Cir. 2009) ("[D]elay alone is rarely considered sufficient to deprive a plaintiff of an adequate forum."); *Awadallah v. W. Union Co.*, No. 14-CV-3493 (RRM), 2016 WL 11469858, at *6 (E.D.N.Y. Mar. 30, 2016) (finding that a 3.5

to 6 years to resolve a case does not render the forum inadequate and collecting cases). As for the suggestion of corruption, Everard's citation to one report by a non-governmental nonprofit is insufficient to overcome federal courts' "reluctan[ce] to find foreign courts 'corrupt' or 'biased,'" at least if based on "meager and conclusory submissions." *In re Arb. between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukr.*, 311 F.3d 488, 499 (2d Cir. 2002); *see Blanco v. Banco Indus. de Venez., S.A.*, 997 F.2d 974, 981 (2d Cir. 1993) (denying assertions of corruption where they are inconsistent with the plaintiff's decision to go into business with the country). The Court notes, too, that the 2022 version of the report cited by Everard states that "[t]he judicial system is understaffed and underfunded but procedurally competent and free of overt government interference." *2022 Index of Economic Freedom: Suriname*, Heritage Found., https://www.heritage.org/index/country/suriname (accessed Mar. 11, 2022).

Second, Everard argues that Suriname is inadequate because its courts adhere to a "loser pays" system that prohibits contingency-fee arrangements such as Everard has used throughout this litigation. But the Second Circuit has adopted the position, shared by most federal courts, that a plaintiff's "claim of financial hardship may not be considered in determining the *availability* of an alternative forum but must be deferred to the balancing of interests relating to the forum's convenience." *Murray*, 81 F.3d at 292–93. The Second Circuit noted further that "[i]f the lack of a contingent-fee system were held determinative, then a case could almost never be dismissed because contingency fees are not allowed in most foreign forums." *Id.* (quoting *Coakes v. Arabian Am. Oil Co.*, 831 F.2d 572, 576 (5th Cir. 1987)); *In re Alcon S'holder Litig.*, 719 F. Supp. 2d 263, 273 (S.D.N.Y. 2010) ("Courts in this District have also specifically and repeatedly held that the availability of contingency fees, class actions, or federal-style discovery is not dispositive of the adequacy of an alternative forum."); *accord Gross*, 386 F.3d at 234 ("A

11

legal system's rules pertaining to fee-shifting and contingent fees reflect policy judgments about the goals of that legal system, the incentives for and against litigation, and the availability of representation in various circumstances.").

Third, Everard argues Suriname is an inadequate forum because his claims would likely be time-barred by Suriname's applicable statute of limitations. Certainly, "an adequate forum does not exist if a statute of limitations bars the bringing of the case in that forum." *Bank of Credit*, 273 F.3d at 246; *see EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 74 (D.D.C. 2017), *aff'd*, 894 F.3d 339 (D.C. Cir. 2018) (collecting cases). But Suriname in its brief stated that "it is willing to waive any limitations defense for the period between commencement and dismissal of this action." Suriname Br. at 4. Courts in this circuit regularly dismiss for *forum non conveniens* on the condition that the defendant "agrees to waive any statute of limitations defense that has arisen since the commencement of this action in the Southern District of New York." *Ziga v. Int'l Ctr. for Transitional Just. Inc.*, No. 1:18-CV-00057 (ALC), 2019 WL 4784675, at *4 (S.D.N.Y. Sept. 27, 2019), *aff'd*, 821 F. App'x 49 (2d Cir. 2020); *see, e.g.*, *Bank of Credit*, 273 F.3d at 248; *Awadallah*, 2016 WL 11469858, at *5, *9; *Bidonthecity.com LLC v. Halverston Holdings Ltd.*, No. 12-CIV-9258 (ALC), 2014 WL 1331046, at *2 (S.D.N.Y. Mar. 31, 2014). Therefore, the statute of limitations does not render Suriname an inadequate forum.

Last, Everard argues that Suriname is inadequate because Findlay has a well-founded fear of traveling to Suriname, stating that it "has no reason to believe that [former President Dési] Bouterse does not still wield substantial power with a concomitant ability to place Findlay or any of [Everard]'s witness[es] in imminent harm." Everard Br. at 7 (citing Findlay Decl. ¶ 40). A plaintiff's well-founded fear of violence can render a forum inadequate. *See, e.g.*, *Rasoulzadeh*

*v. Associated Press*, 574 F. Supp. 854, 861 (S.D.N.Y. 1983), *aff'd*, 767 F.2d 908 (2d Cir. 1985) (finding no alternative forum because "if the plaintiffs returned to Iran to prosecute this claim, they would probably be shot"). But general allegations of political instability in the foreign forum are insufficient to render it inadequate. *See Transunion Corp. v. PepsiCo, Inc.*, 811 F.2d 127, 129 (2d Cir. 1987); *Blanco*, 997 F.2d at 981–82. Everard's claimed fear of reprisal in Suriname was not previously raised in Everard's amended complaint or in Everard's original briefing of Suriname's motion to dismiss. And the conclusory and generalized allegations in his declaration, *see* Findlay Decl. ¶ 40,[1] do not rise to the level of proof that other courts have required to find a foreign forum inadequate on this basis, *see, e.g.*, *Goldfarb v. Channel One Russ.*, 442 F. Supp. 3d 649, 658–59 (S.D.N.Y. 2020) (finding Russia an inadequate forum for defamation suit against Russian state media regarding alleged assassination, relying on an affidavit of a former KGB agent); *Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1199 (S.D.N.Y. 1996) (finding Ghana an inadequate forum where plaintiff's claim was that officials of Ghana had jailed and tortured him); *Guidi v. Inter-Cont'l Hotels Corp.*, 224 F.3d 142, 147–48 (2d Cir. 2000) (remanding for consideration of "Plaintiffs' emotional burden of having to travel to Egypt for trial" where plaintiffs' husbands had been killed and so were "strongly adverse to litigating in a country where foreigners have been the target of hostile attacks").

Because the Court concludes that Suriname would be an adequate alternative forum, it proceeds to balance the public and private interests at stake in dismissing the action to be litigated in Suriname instead.

### C. Public and private interests

---

[1] The Court notes too that an article attached to Findlay's declaration, for which Findlay takes credit, belies Findlay's accusations, stating that in Suriname "[t]here's little evidence of festering hostilities, violent presence of drug cartels, or an incipient crime problem." Findlay Decl., Ex. P.

13

Because of the substantial deference owed to Everard's choice of forum, Suriname has the burden of demonstrating that the balance of private and public interest factors "weigh heavily" in its favor. *R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir. 1991). Relevant private interests include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Lazare Kaplan Int'l Inc. v. KBC Bank N.V.*, 337 F. Supp. 3d 274, 301 (S.D.N.Y. 2018), *aff'd*, 785 F. App'x 18 (2d Cir. 2019) (quoting *Iragorri*, 274 F.3d at 73–74)). And relevant public interests include "administrative difficulties associated with court congestion; the unfairness of imposing jury duty on a community with no relation to the litigation; the interest in having localized controversies decided at home; and avoiding difficult problems in conflict of laws and the application of foreign law." *Id.* at 302–03 (quoting *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 480 (2d Cir. 2002)). In evaluating these interests, the Second Circuit has counseled district courts to "arm themselves with an appropriate degree of skepticism in assessing whether the defendant has demonstrated genuine inconvenience and a clear preferability of the foreign forum." *Gross*, 386 F.3d at 233 (quoting *Iragorri*, 274 F.3d at 75).

1. **Private interests**

Private interests are largely neutral and, at most, slightly favor Suriname as a forum. First, according to the amended complaint and Findlay's sworn declaration, a substantial portion of the strategic and creative work on the Campaign occurred—or, as Suriname contends, failed to occur—in New York. And Everard oversaw at least four subcontractors, all of whom were New York-based. Findlay Decl. ¶ 5. Consequently, there are likely to be a number of witnesses

14

and relevant documents located in New York.  Suriname responds that there are numerous "key documents located in Suriname" and that "many Surinamese citizens and officials who worked with Findlay in Suriname" would be relevant witnesses to Everard's performance of the contracts.  Suriname Br. at 8.  The Court therefore finds it likely that the majority of relevant witnesses reside in Suriname.  But this advantage, while an "important factor," is not dispositive toward Suriname as a forum.  *Zweig v. Nat'l Mortg. Bank of Greece*, No. 91 CIV. 5482 (CSN), 1993 WL 227663, at *7 (S.D.N.Y. June 21, 1993).  Notably, Suriname is a foreign sovereign while Everard is a limited liability corporation with just one member.  Thus, the "burden of litigating abroad is likely a greater obstacle" to Everard than to Suriname.  *Gross*, 386 F.3d at 233.  Further, the suit is largely about Everard's and Suriname's "creative work," which is transportable and lessens the need to conduct proceedings in any particular location.  *Id.*  And those "witnesses whose attendance cannot be compelled can be obtained, for example, through the use of letters rogatory."  *R. Maganlal & Co.*, 942 F.2d at 169 (citing *Overseas Programming Cos. v. Cinematographische Commerz-Anstalt*, 684 F.2d 232, 235 (2d Cir. 1982)).

Second, the need to translate documents and witness testimony from Suriname's official Dutch into English, and vice versa, favors neither forum.  Suriname observes that many of the documents located in Suriname need to be translated into English if litigation proceeds in New York.  Suriname Br. at 7 (citing Reeder Decl. ¶¶ 2, 18, 19).  But such translation would need to occur regardless so that Everard could review the documents, if it has not already.  And as a countervailing consideration, Findlay does not speak Dutch, nor do any of the New York-based subcontractors that Everard hired.  Findlay Decl. ¶ 43.  Suriname responds that "English is very widely spoken in Suriname, including by those in the legal profession in Suriname."  Goossens Decl. ¶ 26.  That observation lessens the burden on Everard's witnesses should they testify in

15

Suriname, but it also suggests a lesser burden on Suriname's witnesses should they testify in New York. In any event, translation costs will be incurred in either jurisdiction and, the Court concludes, New York City has resources to translate relevant evidence from Dutch to English. *See Alnwick v. Eur. Micro Holdings, Inc.*, 281 F. Supp. 2d 629, 648 (E.D.N.Y. 2003) ("Because many documents are in English and Dutch, the translation of documents will be required in either forum."). Even if Suriname would involve relatively lower translation costs, that fact would only slightly favor Suriname as a forum. *Varnelo v. Eastwind Transp., Ltd.*, No. 02-CIV-2084 (KMW) (AJP), 2003 WL 230741, at *24–25 (S.D.N.Y. Feb. 3, 2003).

The Court concludes that private factors slightly favor Suriname as a forum.[2]

**2. Public interests**

Public interests, like the relevant private interests, weigh, at most, moderately in favor of Suriname as a forum. First, court congestion does not disfavor litigation in the Southern District of New York, nor is there proof that Suriname's courts are more or less congested. *See Kravitz v. Binda*, No. 17-CV-07461 (ALC) (SN), 2020 WL 927534, at *12 (S.D.N.Y. Jan. 21, 2020), *report and recommendation adopted*, 2020 WL 917212 (S.D.N.Y. Feb. 26, 2020); *Holzman v. Guoqiang Xin*, No. 12-CV-8405 (AJN), 2015 WL 5544357, at *9 (S.D.N.Y. Sept. 18, 2015).

Second, each potential forum has meaningful connections to the case. Suriname as a forum undoubtably has interests in the lawsuit. A significant portion of the conduct at issue

---

[2] Everard argues that providing a proposed witness list is a "prerequisite" for dismissal on *forum non conveniens* grounds. Everard Br. at 10 n.11 (quoting *Weltover, Inc. v. Republic of Arg.*, 753 F. Supp. 1201, 1209 (S.D.N.Y. 1991)). But courts, including the Supreme Court and the Second Circuit, have rejected such a bright-line requirement. *See, e.g.*, *Piper Aircraft*, 454 U.S. at 258 (stating that "affidavits identifying the witnesses" are "not necessary"); *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 451 n.3 (2d Cir. 1975) (district court did not abuse its discretion "in failing to require detailed disclosure by the defendants of the names of their proposed witnesses and the substance of their testimony"); *Florian v. Danaher Corp.*, 69 F. App'x 473, 475 (2d Cir. 2003) (same); *Wenzel v. Marriott Int'l, Inc.*, No. 13-CIV-8335 (AT), 2014 WL 6603414, at *2 (S.D.N.Y. Nov. 17, 2014), *aff'd*, 629 F. App'x 122 (2d Cir. 2015) (same).

occurred in Suriname, the amended complaint seeks over $2 million from Suriname's treasury, and the public relations campaign at issue was intended to promote Suriname's people and places.  Suriname Br. at 8–10; Dkt. No. 30 at 23–25; Reeder Decl. ¶ 18 (explaining that "local Suriname citizens . . . were heavily invested in the promotional efforts because the development of Suriname's identity and its promotion, both within our country and to the world, is a very important and sensitive endeavor for Suriname").  Everard does not question these weighty interests, nor does the Court.

Yet Suriname errs in asserting that "New York has no interest in this dispute."  Suriname Br. at 9.  Rather, New York has a clear and straightforward interest in adjudicating a dispute that arose from an agreement negotiated and executed in New York by a corporate plaintiff organized under the laws of New York and with its principal place of business in New York, and whose sole member is a New York resident and U.S. citizen.  *See Alnwick*, 281 F. Supp. 2d at 648; *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. BP Amoco, P.L.C.*, No. 03-CIV-0200 (GEL), 2003 WL 21180421, at *9 (S.D.N.Y. May 20, 2003) ("[T]he United States has an interest in adjudicating the contract rights of its corporate citizens under a contract negotiated in the United States . . . ."); *cf. R. Maganlal & Co.*, 942 F.2d at 169 ("[S]ince the contract at issue was negotiated and signed in New York, and the party charged with breach, MG, is a New York corporation, New York has a significant interest in having this breach of contract action litigated in its courts.").  Further, the corollary to Suriname's observation that it would have to pay over $2 million of its sovereign funds is that New York has an interest in a payment of over $2 million, in U.S. currency, to one of its corporations through a New York bank.  *Cf. Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 237–38 (S.D.N.Y. 2005); *Lazare*, 337 F. Supp. 3d at 303 ("New York is also interested in protecting New York residents who conduct business with

17

foreign banks in New York."). New York's interest is not eliminated because Everard sought out a foreign client or because Findlay and others hired by Everard traveled to Suriname to perform work. *See Gross*, 386 F.3d at 231.

Last, Suriname suggests that this case may require the Court to apply foreign law, which would favor Suriname as a forum. *See, e.g.*, *Tel. Sys. Int'l, Inc. v. Network Telecom PLC*, 303 F. Supp. 2d 377, 384–85 (S.D.N.Y. 2003). Whether foreign law applies is disputed, depending on several conflict-of-laws considerations that Suriname has not yet proven. *See* Dkt. No. 33 at 23 n.10. But even if true, the need to apply foreign law alone is insufficient to support dismissal. *See R. Maganlal & Co.*, 942 F.2d at 169 ("[I]t is well-established that the need to apply foreign law is not alone sufficient to dismiss under the doctrine of *forum non conveniens*."); *Nat'l Union Fire Ins. Co.*, 2003 WL 21180421, at *10 ("Because federal courts must often apply foreign law, and the means of pleading and proving foreign law are provided in the Federal Rules of Civil Procedure, interpreting the contracts according to [foreign] law, and instructing a jury on that law if this case should go to trial, are not burdens heavy enough to weight the balance of convenience strongly in favor of dismissing the action.").

In sum, the Court concludes that "each forum can claim a connection to one of the parties" and that the private and public interests at most tip moderately in favor of Suriname. *Gross*, 386 F.3d at 234. Accordingly, the heavy deference owed to Everard's choice of forum is not overcome, and the Court therefore declines to dismiss the case. *See DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 30–31 (2d Cir. 2002)

**IV.   CONCLUSION**

For the reasons articulated above, Suriname's motion to dismiss is DENIED. The Court further denies as unnecessary Suriname's request for oral argument. Dkt. No. 62. The parties

are hereby ORDERED to file a revised case management plan within two weeks of the date of this Opinion & Order.

This resolves docket numbers 54 and 62.

SO ORDERED.

Dated: March 22, 2022
       New York, New York

_____
ALISON J. NATHAN
United States District Judge